UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 12 |
| | : | |
| Mark James Powell, | : | Case No. 4:22-00953-MJC |
| | : | |
| Debtor. | : | |

# O P I N I O N

## I. INTRODUCTION

The matter pending before the Court is the Motion to Dismiss with Prejudice ("Motion to Dismiss") filed by PS Bank ("Bank") on September 1, 2022. Dkt. # 49. The Bank seeks to dismiss the debtor Mark Powell's ("Debtor") bankruptcy case alleging that the bankruptcy was filed in bad faith and the Debtor has no present ability to confirm a Chapter 12 plan due to the Debtor's negative cash flow, which is causing a continuing loss to and diminution of estate.[1] See 11 U.S.C. §1208(c)(9).

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334 and the Standing Order of Reference of the U.S. District Court for the Middle District of Pennsylvania dated March 11, 2016. The matter before the Court is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A). Venue is proper pursuant to 28 U.S.C. §1409(a).

---

[1] Because the Motion to Dismiss is decided on the issue of bad faith, it is unnecessary to address the grounds under §1208(c)(9).

1

## III. PROCEDURAL POSTURE

The Debtor filed this Chapter 12 bankruptcy case on May 23, 2022, shortly on the heels of his previous Chapter 12 bankruptcy case, which was dismissed on April 19, 2022. The Debtor filed a bare bones petition and sought an extension of time to file his schedules and statements.[2] The missing documents were filed on June 7, 2022. See Dkt. #'s 16 -19.

Shortly thereafter, on June 20, 2022, the Debtor filed a motion to convert the case to a Chapter 11 Subchapter V. Dkt. # 24. The motion to convert was amended on July 5, 2022, seeking to convert to a Chapter 11 Small Business case ("Amended Motion to Convert").[3] See Dkt. # 32. The Bank filed an objection to the Amended Motion to Convert, arguing that the Bankruptcy Code does not permit a Chapter 12 debtor to convert to Chapter 11, see 11 U.S.C. §1208(a), and even if such a conversion were permissible, the Court should deny the conversion because the Debtor's case was filed not in good faith.

The Amended Motion to Convert was heard on August 25, 2022 and continued to September 28, 2022 to allow the Bank an opportunity to file a motion to dismiss the case. The Bank filed its Motion to Dismiss on September 1, 2022. At the September 28th hearing, the Court denied the Amended Motion to Convert. See Dkt. # 56. In light of this ruling, the Debtor consented to dismissal of the Chapter 12 case but contested dismissal with prejudice. After an evidentiary presentation, the Court took the Motion to Dismiss under advisement.

---

[2] The Debtor offered no explanation for why the schedules could not be completed prior the filing.

[3] Pursuant to §1221, the Debtor's plan was due on August 21, 2022; however, the Debtor filed the motion to convert.

## IV. FACTS

This is the Debtor's third Chapter 12 bankruptcy case. The Debtor filed the first case on July 30, 2010. The Debtor successfully confirmed a plan on May 29, 2013 and received a discharge on May 10, 2017. The Debtor filed his second Chapter 12 case on April 5, 2017 ("2017 Case"), before the Chapter 12 Trustee filed his final report in the first case. The 2017 Case was fraught with litigation and languished for over five years only to be dismissed when the Debtor was unwilling to incorporate the terms of a Court-approved stipulation in his proposed plan. The 2017 Case was dismissed on April 19, 2022. The current case was filed on May 23, 2022. All tolled, the Debtor has been under the protection of the §362 automatic stay for twelve years and one month.

### A. The 2017 Case

Further discussion of the Debtor's 2017 Case is warranted because the Debtor's actions in that case are relevant to the Motion to Dismiss. Over the course of five years, the Debtor filed eight proposed Chapter 12 plans,[4] none of which were confirmed over the objections of the Chapter 12 Trustee and the Bank.

Approximately six months into the 2017 Case, the Bank filed a motion for relief from the automatic stay which was eventually resolved by the parties via a settlement stipulation ("Settlement Agreement"). The Court approved the Settlement Agreement on December 12, 2018.

---

[4] The initial Chapter 12 plan was filed on June 19, 2017. The amended plans were filed as follows:

First Amended Plan - November 30, 2018
Second Amended Plan – December 26, 2018
Third Amended Plan – March 22, 2019
Fourth Amended Plan – June 7, 2019
Fifth Amended Plan – October 30, 2019
Sixth Amended Plan – July 31, 2020
Seventh Amended Plan – February 16, 2022

3

The Settlement Agreement outlined certain treatment regarding the Bank's claim and required the Debtor to incorporate the terms of the Settlement Agreement into a proposed plan. Shortly after the approval of the Settlement Agreement, the Debtor proposed his Second Amended Plan. The Bank objected to confirmation on the basis that the Second Amended Plan did not properly incorporate the terms of the Settlement Agreement. The Debtor submitted <u>five additional</u> proposed plans all of which did not conform to the terms of the Settlement Agreement with the Bank.[5]

The Bank later filed a second motion for relief from stay alleging that the Debtor was not paying real estate taxes, and in fact paid only a partial payment to remove the real estate from tax sale, and the Debtor failed to keep adequate insurance on the Bank's collateral. The hearing on the second motion for relief was consolidated with confirmation.

The hearing on the Debtor's Sixth Amended Plan commenced on December 7, 2020. After multiple continuances due to scheduling conflicts and attempts at settlement, a continued confirmation hearing was held and concluded on December 14, 2021. Several issues arose including: the binding nature of the Settlement Agreement, funding and feasibility of the plan, admissibility of the Bank's appraisal of the gas leases, and whether the gas leases were property of the estate. On the pivotal issue of the enforceability of the Settlement Agreement, the Debtor maintained that the Court-approved stipulation was not binding on the Debtor.[6] Unpersuaded by the Debtor's arguments with respect to the enforceability of the Settlement Agreement, the Court granted leave to file an amended Chapter 12 Plan of Reorganization that "strictly complies" with

---

[5] At the confirmation hearing on the Seventh Amended Plan, Debtor's Counsel indicated that the Debtor refused to abide by the negotiated terms. Specifically, the Debtor had misgivings about assigning and/or deeding the gas/oil/mineral rights on the Debtor's Bradford County real estate.

[6] Debtor's Counsel argued that pursuant to §1223, if the Debtor pre-confirmation proposed a plan that meets the requirements of §1222, he may propose a plan that is not in conformity to the Settlement Agreement.

Case 4:22-bk-00953-MJC    Doc 58    Filed 10/14/22    Entered 10/17/22 07:41:03    Desc
Main Document    Page 4 of 12

the terms of the Settlement Agreement, otherwise the Court would set a hearing to consider dismissal of the 2017 Case.

The Debtor timely filed his Seventh Amended Plan which was again met with an objection by the Bank. Faced with an unconfirmable plan and no further amendments permitted, the Debtor moved to voluntarily dismiss the 2017 Case. The Bank did not oppose the dismissal or request that the dismissal be with prejudice.

**B. The Current Case**

The Debtor owns a 62 acre farm in Towanda, Pennsylvania, which has a trailer, two barns, and a shop ("Farm"). The Debtor also works as an independent contractor and does subcontracting work for an entity, MR Dirt. According to the initial Schedules I and J, the Debtor reported $1,333.33 of monthly income, $2,903.00 in monthly expenses, for a negative net monthly income of $1,569.67. In advance of the September 28th hearing, the Debtor amended Schedule I on September 22, 2022, Dkt. # 53, which dramatically increased income from $1,333.33 per month to $10,750.00 per month.[7] The Debtor credited his increased income to the fact that it fluctuates drastically and that he increased his trucking business.

The Debtor's Schedule A/B indicates that the Farm is valued at $250,000.00 and the Debtor has $267,890.00 in personal property, which includes several vehicles, trailers, and farm equipment. After the Bank raised issues regarding the inaccuracy of certain information contained in the Schedules, the Debtor amended Schedule A/B to include an omitted bank account with over $10,000.00 in funds.[8] According to Schedule D, the Bank holds secured claims of at least

---

[7] Despite the admission that the Debtor derives significantly more income from his trucking business than farming and he does not qualify as a "family farmer" under Chapter 12, the Debtor continues to list his occupation as a "farmer" on Schedule I.

[8] During his testimony at the September 28th hearing, the Debtor gave no explanation for the missing bank account.

5

$750,000.00 against the Debtor's real estate and personal property.[9] This claims dwarfs the other scheduled secured claim of Chris Roof in the amount of $29,221.31 and the scheduled unsecured claims which total $13,903.33.

As stated previously, no proposed plan has been filed in this case.

## V. LEGAL STANDARDS

### A. Bad Faith as Cause for Dismissal under 11 U.S.C. §1208(c)

Section 1208(c) provides that a Chapter 12 case may be dismissed for cause, enumerating 10 examples of "cause." The code section uses the term "including" which generally indicates that the listed examples are not all encompassing. See In re Gahm, 2000 WL 1277212, *3 (6th Cir. 2000) (unreported). While not specifically listed as an example of cause, "[e]vidence of a bad faith filing constitutes cause for dismissal pursuant to § 1208(c)." In re Anderson, 631 B.R. 417, 421 (Bankr. S.D. Ohio 2021) (quoting In re Burger, 254 B.R. 692, 696 (Bankr. S.D. Ohio 2000)).

The creditor as the moving party bears the burden to demonstrate cause for dismissal. In re Pertuset, 492 B.R. 232, 250 (Bankr. S.D. Ohio), aff'd, 485 B.R. 478 (B.A.P. 6th Cir. 2012) (citing In re French, 139 B.R. 476, 479 (Bankr. D.S.D. 1992)); In re Fennig, 174 B.R. 475, 479 (Bankr. N.D. Ohio 1994).

Because of the similarities between Chapter 12 and Chapter 13 cases, courts have frequently referred to the factors relevant to bad faith under Chapter 13. Anderson, 631 B.R. at 421 (citing Burger, 254 B.R. at 696)); see also In re Carter, 570 B.R. 500, 515 (Bankr. M.D.N.C. 2017) (citing and applying Chapter 13 bad faith factors).

---

[9] In the 2017 Case, the Bank filed Claim No. 8 in the amount of $771,184.43.

The Third Circuit in In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996), determined that the lack of good faith in filing a Chapter 13 case was cause for dismissal under §1307(c). The Lilley Court held that the determination of whether a Chapter 13 case was filed in good faith "must be assessed on a case-by-case basis in light of the totality of the circumstances." Lilley, 91 F.3d at 496 (citing In re Love, 957 F.2d 1350, 1355 (7th Cir. 1992)). The Third Circuit listed the factors relevant to the totality of the circumstances inquiry:

> the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors

91 F.3d at 496 (citing Love, 957 F.2d at 1357); accord In re Myers, 491 F.3d 120, 125 (3d Cir. 2007).

**B. Dismissal With Prejudice for Cause under §349(a)**

Section 349(a) provides:

> (a) Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title.

Thus, Section 349(a) provides that a dismissal of a case does not bar the filing of a subsequent case unless the court "for cause" orders otherwise.

Courts have found sufficient cause for dismissal with prejudice where good faith is lacking. In re Stone Fox Cap. LLC, 572 B.R. 582 (Bankr. W.D. Pa. 2017) (citing In re JER/Jameson Mezz Borrower II, LLC, 461 B.R. 293, 304 (Bankr. D. Del. 2011)). Likewise, cause under §349(a) has been found where debtor made material omissions and errors in the schedules and statements. See

7

In re Jenkins, 2014 WL 268688, at *4 (Bankr. W.D. Ky. Jan. 23, 2014) (dismissing Chapter 12 case with prejudice for cause).

## VI. DISCUSSION

The Bank argues that the Debtor's Chapter 12 case was filed in bad faith and seeks dismissal with prejudice. The Bank relies in part on the Debtor's conduct in his previous Chapter 12 case that was voluntarily dismissed after the Debtor was unable to confirm a Chapter 12 plan after five years and seven amended plans. The Bank also contends that the filing of the petition under Chapter 12 is evidence of bad faith since the Debtor was not eligible to file as a family farmer under §101(18). Furthermore, the Bank argues that filing another bankruptcy case with negative monthly income and so shortly after voluntarily dismissing the previous one is indicia of bad faith. Lastly, the Bank faults the Debtor for failing to: file his schedules and statements with the petition, and even with the extension of time to file them, complete the schedules accurately by omitting a bank account with over $10,000.00 in funds, and account for over $28,000.00 that Debtor received from the Chapter 12 Trustee on the dismissal of the 2017 Case.

In response, the Debtor argues his income is seasonal and his initial Schedules I and J are a correct reflection of his income, and were filed when his income is at its lowest during the year. The Debtor contends that he has since experienced "an uptick" in his trucking business, as well as his farming income. He filed amended Schedule I which reflects the alleged changes in post-petition income.[10] The Debtor further states that when he filed the current Chapter 12 petition, he

---

[10] Curiously, the Debtor did not amend Schedule J to at least correct his net monthly income. Using the reported income on amended Schedule I, the Debtor's net monthly income equates to $7,847.00 ($10,750.00 - $2,903.00). This figure is to be contrasted with the Debtor's assertions in his response to the Motion to Dismiss, in which the Debtor estimates that his prorated monthly income is $9,325.00 after deducting business expenses, and his net monthly income is $6,422.00 after deducting personal expenses. See Debtor's Answer at ¶7, Dkt. # 52.

believed in good faith that he was eligible to file as a family farmer.  The Debtor, however, now concedes that the case should not have been filed under Chapter 12 and cannot remain in Chapter 12.

The Court agrees that the case should be dismissed with prejudice.

To a measurable degree, the Debtor's conduct in the 2017 Case is the basis for this conclusion.[11]  The Settlement Agreement in the 2017 Case was a carefully negotiated compromise among the Debtor, the Bank, and the Chapter 12 Trustee.  As the Debtor's largest secured creditor, the Bank's cooperation in the 2017 Case was essential to plan confirmation.  The Bank supported the reorganization effort so long as it was afforded certain treatment as provided for in the Settlement Agreement.  Unfortunately, immediately after the settlement was approved, the Debtor filed the Second Amended Plan which did not comply with the stated terms.

Over the next three years, the Debtor then filed plan after plan that was met with objections by the Bank and the Chapter 12 Trustee that were predominately based on the failure of the proposed plan to correctly incorporate the precise terms of the compromise.  Once it became apparent that the Debtor flat out refused to comply with the Settlement Agreement, the Court had no choice but to consider dismissal of the case.[12]

Furthermore, throughout the 2017 Case, the Debtor was not maintaining proper insurance on the Bank's collateral and failed to remain current on the real estate taxes.  These failures were

---

[11] The Court may take judicial notice of its own docket. In re Harmony Holdings, LLC, 393 B.R. 409, 413 (Bankr. D.S.C. 2008); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr. E.D. Pa. 1991).  The Court takes judicial notice of the docket entries in the 2017 Case, as well as the contents of the schedules and statements which are not reasonably subject to dispute.

[12] The Court is mindful of the various and highly unpredictable events that can affect farming operations, such as weather and crop prices, which for the most part are out of a debtor's control.  In such instances courts frequently give Chapter 12 debtors more leeway in allowing plan amendments to correct for such unexpected events.  However, that was not the case here.  The Debtor agreed to a compromise with the Bank and refused to perform under the terms of the contract, which delayed the case for years.

somewhat mitigated by the Debtor making monthly payments to the Bank in the amount of $3,150.17. However, the Court finds that the overall objective of the 2017 Case was to delay and frustrate the collection efforts of the Bank. The Debtor's efforts proved very successful because at the same time, the Bank never affirmatively moved to enforce the Settlement Agreement or dismiss the case.

As to the current Chapter 12 case, the Court finds the serious omissions and inaccuracies in the Debtor's schedules and statements more than troubling. First, it is difficult to understand how Debtor's Counsel could overlook and omit a bank account on Schedule A/B for a debtor who is operating a trucking business, much less a bank account with over $10,000.00 in funds. Secondly, the Debtor's initial Schedules I and J – which were filed after the Court granted an extension of time – list **exactly** the same income, expenses, and negative net monthly income as the Debtor's Schedules I and J in the 2017 Case. Frankly, it strains the bounds of credibility that **no** change occurred in the Debtor's income and expenses, despite the passage of over five years between the two filings.[13] Moreover, the Debtor amended his Schedule I, just six days prior to the September 28th consolidated hearing on the Motion to Dismiss and Amended Motion to Convert, to show that the Debtor's monthly income of $1,333.33 had increased significantly to $10,750.00 per month. The timing of this amendment is highly suspect given that one of the major obstacles to conversion to Chapter 11 and also a significant factor supporting dismissal of the case was the Debtor's negative net monthly income.[14]

---

[13] The Debtor testified that he reviewed the Schedules and Statements prior to their filing with the Court.

[14] This is especially true considering the Court questioned the viability of the case due to the negative monthly net income at the August 25, 2022 hearing on a motion to incur debt. The Debtor's admitted inability to fund a plan was squarely at issue when the Debtor was seeking to incur further debt. Nonetheless, the Debtor delayed filing an amendment for nearly another month.

The Court finds that the Debtor's belated and self-serving amendment to Schedule I and the Debtor's supporting testimony at the September 28th hearing are not credible. A rather glaring omission, which the Court pointed out at the September 28th hearing, was the failure of the Debtor to attach statements showing the gross receipts, ordinary and necessary business expenses, and the total monthly net income for the Debtor's farming and trucking operations, as required on Schedule I. The Debtor testified that he employs the services of an accountant, so it would appear to have been a simple exercise to compile statements, however, Debtor's Counsel chose to forgo such evidence and instead put on a disorganized, and at times, confusing presentation regarding the Debtor's income and expenses, leaving to the Court the task of sorting out the numbers. The Court finds it quite telling that the Debtor's testimony was supported by no written documents whatsoever. No contracts, no bank statements, no receipts, no checks, no tax returns – nothing was presented by the Debtor to verify any income or expenses. The Debtor's testimony painted a rosy picture estimating that the trucking operation had grossed $180,000.00 to date and expected to continue to take in an estimated $20,000.00 per month. Without any documentation, the Court rejects this testimony as not credible.

The same is true for the farming income. The Debtor indicated that he has yet to harvest corn or hay, and he will sell the hay in February. The Amended Schedule I claims that the farming income is approximately $150,000.00 ($60,000.00 for corn and $90,000.00 for hay). If that is true, then the Debtor's original Schedule I should have initially reported significantly more income than $1,333.33 per month.

At bottom, the Court finds the Debtor's initial Schedule I and J, the Amended Schedule I, as well as, the Debtor's projected future income as to the trucking business, without documentary support, are not credible. Furthermore, despite being in bankruptcy for the last twelve (12) years

11

with the same law firm as his counsel, it's clear that the Debtor made no effort to complete the schedules, statements, and other documents accurately. Schedule A/B listed the Debtor as having only $300.00 cash and omitted a bank account with over $10,000.00 in funds and a trailer on which the Debtor has a lease to purchase agreement, and as demonstrated above, Schedule I and J are incomplete and inaccurate.

Based on the above material omissions and misstatements on the schedules in the instant case and coupled with the Debtor's conduct in the 2017 Case, this Court concludes that this Chapter 12 bankruptcy case was filed not in good faith.

## VII. CONCLUSION

For the reasons set forth above, the Court finds that the Debtor filed this Chapter 12 bankruptcy petition not in good faith. Accordingly, the case will be dismissed with a one hundred and eighty (180) day bar.

An appropriate order will be entered.

By the Court,

_____
Mark J. Conway, Bankruptcy Judge
Dated: October 14, 2022